IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TANYA BROWN-DICKERSON | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA, et al. | : | NO. 15-4940 |

MEMORANDUM

Dalzell, J.                                                                                                                April 25, 2016

## I.    Introduction

We consider here the defendants' motion to dismiss the first amended complaint. Tanya Brown-Dickerson, in her capacity as the Administratrix of the Estate of Brandon Tate-Brown, and on behalf of a putative class of all others similarly situated, alleges nine causes of action against the City of Philadelphia, Officer Nicholas Carrelli, and Officer Heng Dang. The defendants move to dismiss all claims against the City of Philadelphia, all of plaintiff's claims for injunctive relief, Count V, Count IX, and the Monell claims. Although plaintiff stipulates that Counts II, III, IV, and V are brought against the individual defendant officers only and not the City of Philadelphia, plaintiff opposes the remainder of the defendants' motion to dismiss.

## II.   Standard of Review

A defendant moving to dismiss under Fed. R. Civ. P. 12(b)(6) bears the burden of proving that the plaintiff has failed to state a claim for relief. See Fed. R. Civ. P. 12(b)(6); see also, e.g., Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005). To survive a Rule 12(b)(6) motion, the complaint must contain sufficient factual matter, accepted as true, to state a facially plausible claim to relief. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). A claim is plausible "when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678.

As the Supreme Court stresses, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action…do not suffice." Id. Courts "are not bound to accept as true a legal conclusion couched as a factual allegation." Twombly, 550 U.S. at 555.

In the wake of Twombly and Iqbal, our Court of Appeals laid out a two-part test to apply when considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6):

> First, the factual and legal elements of a claim should be separated. The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a plausible claim for relief.

Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009) (internal citations and quotations omitted). In deciding a motion to dismiss, we may consider "the allegations contained in the complaint, exhibits attached to the complaint and matters of public record," and any "undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." Pension Benefits Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993).

We recite the facts as they appear in the first amended complaint.

### III.   Factual Background

Plaintiff Tanya Brown-Dickerson is the Administratrix of the Estate of Brandon Tate-Brown, her son. First Am. Compl. ¶¶ 1-3. During an early morning traffic stop on December 15,

2014, defendant Officer Nicholas Carrelli shot and killed Tate-Brown. Id. at ¶¶ 2, 16. Defendant Officer Heng Dang was Officer Carrelli's partner at that time. Id. at ¶ 8.

Prior to the traffic stop, Tate-Brown, a twenty-six year old African-American male, was driving a 2014 white Dodge Charger with Florida license plates. Id. at ¶¶ 16, 18-19. Tate-Brown worked at a rental car agency and was using the car with his manager's permission. Id. at ¶ 33.

Officers Carrelli and Dang of the Philadelphia Police Department (the "PPD" or "Department") were patrolling in the 15th Police District in a marked police cruiser. Id. at ¶ 17. The officers saw Tate-Brown driving around the 6000 block of Frankford Avenue with only his daytime running lights on. Id. at ¶¶ 18-19. After the officers turned on their police lights and signaled for him to pull over, Tate-Brown complied and pulled over on the 6700 block of Frankford Avenue. Id. at ¶ ¶ 19-20. Plaintiff avers that surveillance video demonstrates that Tate-Brown's headlights were actually on when he was pulled over. Id. at ¶ 21. Tate-Brown and the officers had a long interaction before they asked him to step out of the car. Id. at ¶ 22. Plaintiff believes the video shows that Officer Carrelli had his gun pointed at Tate-Brown while he was still in the car. Id. at ¶ 23.[1]

Plaintiff alleges that the defendant officers "began an aggressive interaction with [Tate-Brown] with the intent of harassing [him], instigating a struggle, assaulting him, arresting him, and charging him with a crime." Id. at ¶ 31. After the officers began questioning Tate-Brown about the car, he explained that he worked for Hertz, told them he was using the car with his manager's permission, and gave the officers the appropriate paperwork, along with his

---

[1] Although various police reports and documents state that the officers pulled Tate-Brown over because they were concerned about him driving without headlights, plaintiff believes that those accounts are inconsistent with the officers' conduct at the scene, including acting aggressively and drawing their guns while Tate-Brown was still in the car. First Am. Compl. ¶¶ 24-26. Plaintiff alleges that this was one of several inconsistent or false statements made by various police officers over the course of the investigation. Id. at ¶¶ 27-29.

manager's phone number and other contact information. Id. at ¶¶ 32-33. The officers called in the license plate, learned that the car was registered to Dollar Rental Car, not Hertz, and on that basis ordered Tate-Brown to exit the car. Id. at ¶¶ 34, 41.[2]

After Tate-Brown exited the vehicle, Officer Carrelli claims he spotted a gun lodged between the center console and the passenger seat, prompting him to yell "Gun" to Officer Dang. Id. at ¶ 43. Officer Dang pointed his gun at Tate-Brown's back and demanded to know where the gun was. Id. at ¶ 45. Tate-Brown denied having a gun. Id. at ¶ 46. Tate-Brown and Officer Dang began to struggle. Id. at ¶ 51. Both officers began to beat Tate-Brown. Id. at ¶¶ 53-56. Tate-Brown, who did not fight back and was unarmed, eventually broke free and ran toward the rear of his car. Id. at ¶¶ 56-58, 61. As Tate-Brown was running, Officer Carrelli shot him once in the back of the head, killing him. Id.

After the incident, Officer Carrelli told his sergeant that Tate-Brown had run to the passenger side door and was reaching for the gun when he shot him. Id. at ¶ 62. The Department has subsequently admitted that this was not true and Tate-Brown was near the rear of the car when he was shot. Id.[3] Officers Carrelli and Dang also made false statements about the struggle with Tate-Brown, such that he had made it back into his car several times and tried to reach for his gun before he was shot. Id. at ¶¶ 64-65. Although the Department's official position was that Tate-Brown's shooting was justified because he was reaching for a gun, in June of 2015 the

---

[2] Dollar Rental Car is a wholly owned subsidiary of Hertz, and plaintiff alleges that reasonable police officers should know that rental cars are often not registered in the rental dealership's name because of overlapping ownership or franchisee relationships, and therefore Officers Carrelli and Dang should have known that such a discrepancy was not a basis for asking Tate-Brown to exit the car or to arrest him. First Am. Compl. ¶¶ 34, 36-39.

[3] Plaintiff alleges that Tate-Brown's body was moved after he was shot to be closer to the passenger side door in order to bolster the officers' account. First Am. Compl. ¶ 84. Plaintiff also avers that the investigation after Tate-Brown's shooting was improper and that the PPD persisted in concealing video surveillance of the shooting for six months because the surveillance contradicted its official account of the incident. Id. at ¶¶ 100-05.

Department admitted there was no evidence that Tate-Brown was reaching for a gun when he was shot. Id. at ¶ 67, 71.[4]

Officers Carrelli and Dang have not been disciplined and continue to work as Philadelphia police officers. Id. at ¶ 92. Plaintiff believes that the PPD's training deficiencies were a substantial factor in, and proximate cause of, Tate-Brown's death. Id. at ¶ 93. Plaintiff cites to a recent Department of Justice Report ("DOJ Report"), as well as an ongoing lawsuit in this Court, in support of that contention. Id. at ¶¶ 93, 109-18, 125-27.

In Count I of the first amended complaint, plaintiff brings a wrongful death claim under Pennsylvania law. First Am. Compl. ¶¶ 134-36. In Counts II-IV, plaintiff brings state law claims for false arrest, assault, and battery pursuant to Pennsylvania's survival statute. Id. at ¶¶ 138-49. In Count V, plaintiff alleges a violation of 42 Pa. C.S. § 8309 et seq. Id. at ¶¶ 151-56. In Count VI, plaintiff requests declaratory and injunctive relief under the Pennsylvania Constitution. Id. at ¶¶ 157-62. In Count VII, plaintiff brings a claim under 42 U.S.C. § 1983 for violations of the Fourth Amendment, both on behalf of Tate-Brown's Estate and a class of all others similarly situated. Id. at ¶¶ 164-70. In Count VIII, plaintiff brings another Section 1983 claim for violations of the Fourteenth Amendment's Equal Protection Clause on behalf of the Estate and the putative class. Id. at ¶¶ 172-76. In Count IX, plaintiff brings a claim under 42 U.S.C. § 2000(d) et seq. on behalf of the Estate and the putative class. Id. at ¶¶ 178-84.

---

[4] Plaintiff also alleges that the gun the PPD later recovered from Tate-Brown's car was planted by PPD officers to bolster the defendant officers' account and that the evidence team intentionally contaminated the allegedly planted gun with Tate-Brown's DNA. First Am. Compl. ¶¶ 66, 73-81, 88.

**IV.     Discussion**

Defendants move to dismiss (1) all claims against the City of Philadelphia, (2) plaintiff's claims for injunctive relief, (3) Count V, and (4) Count IX. Defs.' Mot. to Dismiss ("MTD") at 5. Plaintiff stipulated that Counts II, III, IV, and V are not brought against the City of Philadelphia itself, but in all other respects opposes the defendants' motion to dismiss. Pl.'s Resp. in Opp. ("Resp.") at unnumbered p. 32. We consider the parties' arguments.

**A.     Count I: Wrongful Death Claim**

The City argues that since it enjoys immunity from the underlying state law torts in Counts II, III, IV, and V, it cannot be held liable for plaintiff's wrongful death claim in Count I. MTD at 9. Although plaintiff concedes that Counts II through V are not brought against the City of Philadelphia, plaintiff argues that the wrongful death claim in Count I can be predicated on the alleged violations of Section 1983 in Counts VII and VIII. Pl.'s Resp. at unnumbered pp. 32-33.

Pennsylvania's wrongful death statute provides that a decedent's spouse, child, or parent may bring an action to recover damages for a death caused by the wrongful act, neglect, unlawful violence or negligence of another, provided that there is no duplicate recovery. 42 Pa. C.S. § 8301(a), (b). Brown-Dickerson is a proper plaintiff. See Pa. R. Civ. P. 2202(a), (b) (defining which persons may bring a wrongful death action). Wrongful death actions are derivative of the underlying tortious acts that caused the fatal injury, and such claims depend upon the decedent's cause of action being viable at the time of death. Sunderland v. R.A. Barlow Homebuilders, 791 A.2d 384, 391 (Pa. Super. Ct. 2002).

Our Court has previously found that although no case has directly addressed whether a constitutional violation can serve as the wrongful act triggering the application of Section 8301, a claim under Section 8301 is still a state law claim subject to Pennsylvania's Political

6

Subdivision Tort Claim Act ("PSTCA"). Momot v. City of Philadelphia, 2012 WL 1758630, *4 (E.D. Pa. May 16, 2012) (DuBois, J.). In Momot, plaintiff argued that his wrongful death claim should survive the City's motion to dismiss because it was based on a constitutional claim, not state law, and was therefore not barred by the PSTCA. Id. But Judge Dubois held that a wrongful death claim was, in fact, a state law claim subject to the PSTCA, regardless of the nature of the wrongful act triggering the operation of the Wrongful Death Act. Id.

The PSTCA does not insulate the City of Philadelphia from federal law claims. See, e.g., Wade v. City of Pittsburgh, 765 F.2d 405, 407-08 (3d Cir. 1985). But wrongful death actions, embedded in cases bringing federal civil rights claims, remain state law claims. See Momot, 2012 WL 1758630, *4 (citing cases for the proposition that actions brought under the Wrongful Death Act are state law claims sounding in tort).

The PSTCA provides municipalities with general immunity from tort liability "on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person." 42 Pa. C.S. § 8541. But the PSTCA provides a limited waiver of this general immunity if (1) the damages would be recoverable under common law or a statute creating a cause of action if the injury were caused by a person without such governmental immunity, and (2) the injury was caused by the negligent acts of the local agency or its employee acting within the scope of his duties with respect to eight enumerated types of acts. 42 Pa. C.S. § 8542(a). Those eight acts include (1) vehicle liability, (2) care, custody, or control of personal property, (3) real property, (4) trees, traffic controls, and street lighting, (5) utility service facilities, (6) streets, (7) sidewalks, and (8) care, custody, or control of animals. 42 Pa. C.S. § 8542(b).

Plaintiff argues that the wrongful death claim can be predicated upon the alleged violations of Section 1983 in Counts VII and VIII. Pl.'s Resp. at unnumbered pp. 32-33. Count VII alleges violations of the Fourth Amendment, and Count VIII alleges violations of the Fourteenth Amendment. First Am. Compl. ¶¶ 164, 172. But the allegedly unlawful violations of Tate-Brown's Fourth and Fourteenth Amendment rights do not fall within those eight narrow classes of activity.

We will therefore dismiss with prejudice Count I of the first amended complaint as to the City of Philadelphia only.

### B.      Count V: Violation of 42 Pa. C.S. § 8309

The City argues that plaintiff's civil rights claim under 42 Pa. C.S. § 8309 fails as a matter of law because there are no allegations from which a factfinder could reasonably infer that a racial hatred of African-Americans motivated Officers Carrelli and Dang's alleged assault of Tate-Brown. MTD at 9-10. Plaintiff responds that while there are no allegations that the defendant officers have a hatred of African-Americans, the allegations that they acted maliciously and with racial prejudice when assaulting Tate-Brown satisfy Section 8309's animus requirements. Pl.'s Resp. at unnumbered pp. 34-35.

In relevant part, Section 8309 creates a cause of action for personal injuries incurred as a result of ethnic intimidation. See 42 Pa. C.S. § 8309 (creating the right of action for injuries incurred as a result of conduct described in 18 Pa. C.S. § 2710). The offense of ethnic intimidation is the commission of other enumerated offenses "with malicious intention toward the race, color, religion or national origin of another individual or group of individuals." 18 Pa. C.S. § 2710(a). Malicious intention means "the intention to commit any act…motivated by hatred toward the race, color, religion or national origin of another individual or a group of

individuals." 18 Pa. C.S. § 2710(c). The statute requires showing that, in the course of committing the predicate offense, the actor manifested a malicious intent toward the intended victim and had as motivation the hatred of the victim's race, color, religion, or national origin. Commonwealth v. Sinnott, 30 A.3d 1105, 1109 (Pa. 2011). Ethnically malicious intent must be present concurrent with the underlying criminal act, and evidence of other, non-criminal intent does not negate evidence of racial animus -- meaning ethnic malice need not be the sole motivator. Id. at 1110.

   Plaintiff alleges that the defendant officers' actions were "tinged with intentional racial bias." First Am. Compl. ¶ 95. Plaintiff also alleges that, in the aftermath of Tate-Brown's killing, the PPD intentionally lied about the facts of his death to avoid "another Ferguson" in Philadelphia. Id. at ¶ 99. Plaintiff also cites to the DOJ Report's finding that black suspects are most likely to be the subject of threat perception failures by police, meaning police are more apt to believe the suspect is armed when he is not. Id. at ¶¶ 116, 123. Plaintiff also claims, citing allegations in prior litigation, that the Department has a history of using unreasonable force based on race and ethnicity. Id. at ¶ 126.

   A claim is plausible when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Iqbal, 556 U.S. at 678. To withstand defendants' motion to dismiss Count V, the first amended complaint would have to plead sufficient factual matter, accepted as true, to allow us to draw the reasonable inference that Officers Carrelli and Dang pulled over Tate-Brown's car and then falsely arrested, assaulted, battered, and killed him with a malicious intent motivated by ethnic hatred. Even accepting the factual allegations in the first amended complaint as true, those averments do not permit the Court to draw the reasonable inference that the defendant officers acted with the

9

requisite racial animus. The leap required from these predicate allegations to a conclusion of racial animus is not the type of reasonable inference that plaintiff is entitled to under Iqbal and Twombly. Such a leap would require us to infer that Tate-Brown's race, the DOJ Report's findings regarding threat perception failures, prior litigation against the City of Philadelphia, and the PPD's actions after the shooting lead to the conclusion that Officers Carrelli and Dang pulled over, assaulted, and eventually shot Tate-Brown because of racial animus. That is not, under these alleged facts, a reasonable inference. We will therefore dismiss Count V of the first amended complaint with prejudice.

### C. Class Action Claims for Injunctive Relief

The City argues that plaintiff lacks standing to bring class action claims for injunctive relief in Counts VI, VII, VIII, and IX. MTD at 10. Plaintiff claims that there is standing for these claims seeking injunctive relief based upon Pennsylvania's survival statute. Pl.'s Resp. at unnumbered p. 35. Pennsylvania's survivorship statute provides that "All causes of action or proceedings, real or personal, shall survive the death of the plaintiff or of the defendant, or the death of one or more joint plaintiffs." 42 Pa. C.S. § 8302. The survival statute thus permits the decedent's personal representative to continue the right of action accruing to the decedent because of the tort and allows the decedent to recover through the legal "person" of his estate. Tulewicz v. Southeastern Pa. Transp. Auth., 606 A.2d 427, 431 (Pa. 1992).

To the extent that plaintiff is bringing Counts VI, VII, VIII, and IX through the vehicle of Pennsylvania's survival statute, she is the correct party to pursue Tate-Brown's claims. Whether plaintiff has Article III standing to pursue these class action claims for injunctive relief is a question of federal, not state, law.

In order to have standing under Article III, there must be an actual case or controversy, meaning that the plaintiff has sustained, or is immediately in danger of sustaining, some direct injury as a result of the challenged official conduct, and the injury or threat of injury must be real and immediate, not conjectural or hypothetical. City of Los Angeles v. Lyons, 461 U.S. 95, 101-02 (1983). Past wrongs alone do not amount to the real and immediate threat of future injury that is necessary to create a case or controversy. Id. at 103 (citing Rizzo v. Goode, 423 U.S. 362, 372 (1976)). If a plaintiff lacks standing in his own right, he cannot seek relief on behalf of a purported class. O'Shea v. Littleton, 414 U.S. 488, 494 (1974). Standing has both constitutional and prudential components, both of which must be satisfied before a litigant may seek redress in federal court. UPS Worldwide Forwarding, Inc. v. United States Postal Serv., 66 F.3d 621, 625 (3d Cir. 1995). Our prudential standing rules require that (1) a litigant assert his own legal interests rather than those of third parties, (2) courts refrain from adjudicating abstract questions of wide public significance that amount to generalized grievances, and (3) a litigant demonstrate that his interests are arguably within the zone of interests intended to be protected by the statute, rule, or constitutional provision on which the claim is based. Id. at 626.

The constitutional minimum of standing requires that: (1) a plaintiff suffers an injury in fact, meaning an invasion of a legally-protected interest which is (a) concrete and particularized, and (b) actual and imminent, not conjectural or hypothetical; (2) there is a causal connection between the injury and the conduct complained of, meaning that the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, not merely speculative, that the injury will be redressed by a favorable decision. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). Even though a plaintiff may represent a class of persons, that plaintiff must still allege a

distinct and palpable injury to himself, even if it is an injury shared by a larger class of other possible litigants. Warth v. Seldin, 422 U.S. 490, 501 (1975).

Importantly, a plaintiff must establish a justiciable case or controversy with respect to each form of relief she seeks. Williams v. BASF Catalysts LLC, 765 F.3d 306, 327 (3d Cir. 2014) (citing Lyons, 461 U.S. at 102-03). Even if a plaintiff has standing for a damages claim, she must establish standing in order to obtain prospective relief. Id. (citing Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 210-11 (1995)). Judicial power does not extend to hypothetical disputes. Id. A plaintiff must have a personal stake in the outcome of the litigation. United States Parole Comm'n v. Geraghty, 445 U.S. 388, 397 (1980).

In a class action lawsuit, Article III standing must be satisfied by at least one named plaintiff. Neale v. Volvo Cars of N.A., LLC, 794 F.3d 353, 359 (3d Cir. 2015). Without a reasonable likelihood of future injury, there is no basis for seeking injunctive relief. See, e.g., McNair v. Synapse Grp. Inc., 672 F.3d 213, 225-26 (3d Cir. 2012) (explaining further that plaintiffs could not successfully invoke the "capable of repetition yet evading review" doctrine because they could not make a reasonable showing that they would again be subjected to the alleged illegality). The doctrine of "capable of repetition, yet evading review" only applies when (1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again. Spencer v. Kemna, 523 U.S. 1, 17-18 (1998).

In a class action context, the mootness of a plaintiff's individual claim after a class has been certified does not render the class action moot. Geraghty, 445 U.S. at 397. When a claim on the merits is "capable of repetition, yet evading review," the named plaintiff may litigate the class certification issue despite having lost his personal stake in the outcome of the litigation. Id.

at 398. Where there is no chance that the named plaintiff's expired claim will reoccur, mootness can be avoided by certifying the class prior to the expiration of the named plaintiff's claim. Id. If class certification is erroneously denied, then the corrected ruling certifying the class would relate back to the time of the erroneous denial of the certification motion. Genesis Healthcare Corp. v. Symczyk, 133 S.Ct. 1523, 1530 (2013) (summarizing the holding in Geraghty). Geraghty was explicitly limited to cases in which the named plaintiff's claim was live at the time the district court denied class certification. Id. Further, the "relation-back" exception for inherently transitory harms is narrow, relating only to cases where the challenged conduct is effectively unreviewable because no plaintiff would possess a personal stake in the suit long enough for the litigation to run its course. Id. at 1531.

      Plaintiff, on behalf of the Estate of Brandon Tate-Brown, lacks standing to seek injunctive relief -- either individually or as a class representative. Claims that accrued during Tate-Brown's life survive his death and may be pursued by his Estate, such as damages claims. But even if the Estate has standing for damages claims, the Estate must have separate standing to obtain prospective relief and it cannot seek such relief because there is no chance that it or Tate-Brown will again suffer the harm complained of. Without a reasonable likelihood of future injury, there is no basis for seeking injunctive relief. Because the Estate lacks standing in its own right, it cannot be the named plaintiff in a putative class action lawsuit. At the time of the filing of this complaint, Tate-Brown was already deceased, and so there is no point in time to which Tate-Brown's claims can relate back for purposes of avoiding mootness. This is different from Geraghty, where the mootness of the individual claim occurred after class certification was erroneously denied. Here, plaintiff's claim for injunctive relief has been moot since the beginning of this case.

This is not the type of case that falls within the narrow confines of the "capable of repetition, yet evading review" doctrine as there is no reasonable expectation that this plaintiff will be subject to the same action again. Spencer, 523 U.S. at 17-18. The challenged action is not too short in duration to be fully litigated prior to its cessation or expiration. Plaintiff avers that as a result of the PPD's policies, practices, and customs, as identified in the DOJ Report and other litigation, "other citizens of Philadelphia are at imminent risk of harm, injury and police misconduct in the use of force, should they come into contact with, be arrested by, or be subjected to use of force by police." First Am. Compl. ¶¶ 158, 160. Such allegations suggest an ongoing and persistent problem that can be litigated without the litigant needing to avail himself of such a narrow doctrine.

Although Pennsylvania's survivorship statute provides that causes of action survive death, that statute cannot confer Article III standing. Even if Tate-Brown, and not his Estate, were the plaintiff, he would have been unable to demonstrate a sufficient likelihood of injury to warrant equitable relief. See, e.g., Hodgers-Durgin v. de la Vina, 199 F.3d 1037, 1044 (9th Cir. 1999) (explaining that the factual record did not support a belief that the plaintiffs would again be stopped by Border Patrol, even though they traveled hundreds of miles a week and saw such agents nearly every day). The facts pled in the first amended complaint, even taken as true, do not demonstrate a sufficient likelihood of imminent harm as past wrongs do not amount to the real and immediate threat of injury necessary to make out a case or controversy. See Lyons, 461 U.S. at 104 (discussing the holding in Rizzo v. Goode, 423 U.S. 362 (1976) to explain that there was no case or controversy where the claim of injury rested upon what one or a small, unnamed minority of policemen might do in the future because of the unknown policeman's perception of departmental procedure). The first amended complaint does not contain sufficient factual matter

to demonstrate a likelihood that Tate-Brown would again be stopped and subjected to alleged police misconduct in order to create a live case or controversy. Where a plaintiff seeks injunctive or declaratory relief, there is no standing if the adjudication rests upon contingent future events that may not occur as anticipated, or may not occur at all. Pryor v. National Collegiate Athletic Ass'n, 288 F.3d 548, 561 (3d Cir. 2002). Such is precisely the case here.

We will therefore dismiss with prejudice Count VI of the first amended complaint, which seeks only declaratory and equitable relief. We will also dismiss with prejudice all of plaintiff's class action claims to the extent they are sought or pled in Counts VII, VIII, and IX.

D.     **Count IX: 42 U.S.C. §2000d Claim**

The City argues that Count IX fails as a matter of law because Title VI of the Civil Rights Act of 1964 is not intended to cover claims of this type, plaintiff lacks standing, and the individual defendants cannot be held liable under Title VI. MTD at 13-14. Plaintiff counters that her Title VI claim should not be dismissed because Tate-Brown, and those in the putative class, "are the intended beneficiaries of the federal funding." Pl.'s Resp. at unnumbered p. 43.

Title VI of the Civil Rights Act prohibits discrimination on account of race, color, or national origin under any program or activity that receives federal financial assistance. 42 U.S.C. § 2000d. Private plaintiffs may bring suit under Title VI for violations caused by intentional discrimination, but not disparate impact discrimination. Alexander v. Sandoval, 532 U.S. 275, 293 (2001). The statute ensures that when federal funding is given to a non-federal entity which, in turn, provides financial assistance to the final beneficiary, those funds will not be used for a discriminatory purpose. Grove City Coll. v. Bell, 687 F.2d 684, 691 (3d Cir. 1982) (explaining that the legislative history of Title VI clearly indicates an intent to cover indirect assistance programs, including educational programs).

15

To establish standing under Title VI, the plaintiff must be the intended beneficiary of the federal spending program. NAACP v. Medical Center, Inc., 599 F.2d 1247, 1252 (3d Cir. 1979). See also Simpson v. Reynolds Metal Co., Inc., 629 F.2d 1226, 1235 (7th Cir. 1980) (explaining that the private plaintiff must be the intended beneficiary of, an applicant for, or a participant in a federally-funded program in order to bring a Title VI action). A threshold question is whether the alleged racial discrimination occurred under a program or activity that receives federal financial assistance. Burks v. City of Philadelphia, 950 F. Supp. 678, 682-83 (E.D. Pa. 1996).

Plaintiff pleads that the PPD receives federal funding and grants. First Am. Compl. ¶ 178. But plaintiff has not pled facts sufficient to demonstrate that the Estate or the members of the putative class are the intended beneficiaries of whatever federal funds the Department benefits from, nor has plaintiff pled with sufficient factual particularity what federal funds the PPD receives. Plaintiff pleads that the Department receives funding and grants "covering the subjects of law enforcement, traffic stops, use of force, arrest, search, seizure, reasonable suspicion, and probabl[e] cause." Id. Plaintiff then pleads that persons "who come into contact with police, including decedents, are the intended beneficiaries of the federal funding." Id. at ¶ 179.

Title VI does not contemplate such an attenuated relationship between federal funding and plaintiff. Nor has plaintiff pled with requisite specificity what federal funding the PPD receives and how that funding is then used in any program of which plaintiff is the intended beneficiary. Further, the proposed causal nexus in Count IX is the PPD's alleged failure to train. See id. at ¶ 182 (emphasis added) ("As a direct and proximate cause of said policies and customs, and lack of training and supervision, Plaintiff was injured and killed."). As this Court has previously observed, there is no case law that suggests a private plaintiff can use Title VI to bring what is, in essence, a failure to train claim. See Massi v. City of Philadelphia, 2013 WL

16

1194643, *5 (E.D. Pa. Mar. 25, 2013) (Pratter, J.) (finding that allowing plaintiff to bring a claim in such a manner would subvert our Court of Appeals's holding that Section 1983 treats a municipality and its police department as the same entity).

We will therefore dismiss Count IX of the first amended complaint with prejudice.

### E.    Counts VII and VIII: *Monell* Claims

The City argues that plaintiff fails to allege training deficiencies sufficient to state a viable Monell claim. MTD at 15. Plaintiff responds that she has adequately pled such a claim based on her citations to prior reports and litigation, which she argues demonstrate the PPD's deliberate indifference and failure to train its police officers on the proper use of deadly force. Pl.'s Resp. at unnumbered p. 44.

A municipality is not liable for its employees' constitutional torts under a theory of respondeat superior -- that is, a municipality cannot be held liable for its employees' torts solely by virtue of their employment relationship. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978). A municipality is liable for its employees' violations of Section 1983 only where the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." Id. at 694.

A plaintiff can demonstrate the existence of a governmental policy by showing "that a 'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issued an official statement of policy." Jiminez v. All American Rathskeller, Inc., 503 F.3d 247, 250 (3d Cir. 2007) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986)) (internal alterations omitted). To show a custom, a plaintiff must establish that state officials engaged in a course of conduct so permanent and well-settled that it operated as law. Id. (citing Monell, 436 U.S. at 690).

A plaintiff must show a governmental policymaker's responsibility for, or acquiescence in, the alleged tort. Id. (citing Andrews v. City of Philadelphia, 895 F.2d 1496, 1480 (3d Cir. 1990)). A plaintiff need not specifically identify the responsible decisionmaker, since practices that are considered custom or policy under Monell are ascribable to municipal decisionmakers. Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990). Thus, even if a custom or policy "has not been formally approved by an appropriate decisionmaker," it "may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." Board of Cnty. Comm'rs v. Brown, 520 U.S. 397, 404 (1997).

To be liable under Section 1983, "the government must act with deliberate indifference to the purported constitutional deprivation." Jiminez, 503 F.3d at 250. As a result, a failure to train may constitute a policy or custom giving rise to Section 1983 liability for a municipality only if such failure demonstrates deliberate indifference to residents' constitutional rights. See City of Canton v. Harris, 489 U.S. 378, 389 (1989). A failure to train evinces deliberate indifference if

> in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.

Id. at 390.

There must also be "a 'direct causal link between a municipal policy or custom and the alleged constitutional deprivation' to ground municipal liability." Jiminez, 503 F.3d at 249 (quoting City of Canton, 489 U.S. at 385). As our Court of Appeals has explained, causation is often a question for the jury:

> [T]o sustain a § 1983 action against the City, plaintiffs must simply establish a municipal custom coupled with causation – i.e., that policymakers were aware of similar unlawful conduct in the past, but failed to take precautions against future violations, and that this

> failure, at least in part, led to their injury. If the City is shown to have tolerated known misconduct by police officers, the issue whether the City's inaction contributed to the individual officers' decision to arrest the plaintiffs unlawfully in [a given] instance is a question of fact for the jury.

Bielevicz, 915 F.2d at 851.

At this early stage of the litigation, it would be premature to dismiss plaintiff's claims in Count VII, but we will dismiss Count VIII. Plaintiff alleges that because Officers Carrelli and Dang were improperly trained, they stopped Tate-Brown without any reasonable suspicion or probable cause, escalated the traffic stop unnecessarily, engaged in a violent confrontation, and eventually killed him. Plaintiff further alleges that PPD officers do not receive regular, consistent training on the Department's use of deadly force policy, that they receive only cursory de-escalation training, do not regularly receive in-service training on threat perception, decision-making, and de-escalation, and do not receive in-service defensive tactics training. First Am. Compl. ¶ 114.

In the procedural posture of a motion to dismiss, a claim is plausible if the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the alleged misconduct. Iqbal, 556 U.S. at 678. Although defendants are correct that not all of the changes recommended in the DOJ Report pertain to the types of events that led to Tate-Brown's death, plaintiff has identified a number that do. Plaintiff had done more than point to improvements which could be made. All of the DOJ Report's recommendations come from identified deficiencies in the existing training. At this early stage, plaintiff has pled sufficient facts that, if accepted as true, could make a plausible claim that the need for more or different training was sufficiently obvious, and the inadequacy so likely to result in the violation of citizens' Fourth Amendment rights, that the City could be found to have been deliberately

indifferent. See, e.g., City of Canton, 489 U.S. at 396 (Ginsburg, J., concurring) (explaining that Monell is satisfied when a Section 1983 plaintiff can demonstrate that the facts available to city policymakers put them on actual or constructive notice that the particular omission was substantially certain to result in the violation of citizens' constitutional rights). It would be premature to dismiss this claim without the benefit of further discovery.

But plaintiff has not pled sufficient factual matter, accepted as true, to state a plausible claim in Count VIII under the Equal Protection Clause. Plaintiff alleges that there is a policy, practice, or custom of racial discrimination by the City of Philadelphia and that the defendants "have actively targeted African Americans and minorities for unlawful treatment." First Am. Compl. ¶¶ 172, 174. But the DOJ Report's finding of racial disparities in threat perception failures is not enough to sustain that claim in the face of a motion to dismiss, and the first amended complaint's other allegations regarding existing litigation are similarly unavailing. Id. at ¶ 117.

We will therefore deny defendants' motion to dismiss plaintiff's claim in Count VII, but we will dismiss Count VIII with prejudice.

## V.     Conclusion

We will dismiss with prejudice Count I of the first amended complaint with respect to the City of Philadelphia only, as well as Counts V, VI, VII, and IX in their entirety. We will also dismiss with prejudice all of plaintiff's class action claims to the extent they are sought or pled in Count VIII. An appropriate Order follows.

BY THE COURT:

 /s/ Stewart Dalzell, J.
Stewart Dalzell, J.